MICHAEL J. FABER, Bar No. 89149
email: mfaber@faberlaw.net
12400 Wilshire Blvd., Ste. 400
Los Angeles, CA 90025
(310) 442-6610(Telephone)
(310) 442-6612 (FAX)

Attorneys for Plaintiff
ALEXANDER MIRZA, an individual

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDER MIRZA, an individual, | Case No. 2:17-07140-RGK (KSx) |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR DAMAGES** |
| vs. | |
| CACHET HOTEL GROUP LIMITED CAYMAN L.P., a limited partnership; CACHET HOTEL GROUP LIMITED (HK), a limited partnership; and DOES 1-10 | **1.  RETALIATION;** |
| | **2.  DISCRIMINATION;** |
| | **3.  WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY;** |
| Defendants. | **4.  BREACH OF CONTRACT** |
| | **5.  WAITING TIME PENALTIES (Cal Lab. Code §§ 201-203)** |
| | **6.  FAILURE TO INDEMNIFY IN VIOLATION OF LABOR CODE §2802** |
| | **JURY TRIAL DEMAND** |

## INTRODUCTORY ALLEGATIONS

1.  Plaintiff Alexander Mirza is, and at all times relevant hereto was, a resident of the State of California, County of Los Angeles

2.  Plaintiff is informed and believes, and thereon alleges, that defendants Cachet Hotel Group Limited Cayman L.P. and Cachet Hotel Hospitality Group are,

1 and at all times relevant hereto were, limited partnerships authorized and doing
2 business within the State of California, County of Los Angeles. Robert Roche was, at
3 all times relevant, the Chairman of both Cachet defendants.

4      3. The true names and capacities of defendants Does 1 to 10, inclusive,
5 whether individual, corporate, associate or otherwise, are not known to plaintiff, who
6 therefore sues said defendants by such fictitious names.  Plaintiff is informed and
7 believes, and thereon alleges, that each of said fictitiously named defendants is
8 somehow responsible for the damage complained of herein, and plaintiff will pray
9 leave to amend this complaint to show their true names and capacities when same
10 have been ascertained.

11      4. At all times herein mentioned, each defendant was the agent, servant and
12 employee of its remaining co-defendants, and was at all times acting within the
13 course and scope of said agency, service or employment.

14      5. Plaintiff is a hotel industry veteran, who for several years served on the
15 management teams of Hilton and Starwood. In the spring of 2012, plaintiff was
16 President of SBE Hospitality which owns SLS and other luxury hotels. At the time,
17 plaintiff was in China negotiating a deal on behalf of SBE Hospitality when he met
18 Robert Roche. Plaintiff approached Mr. Roche as an investor, with a business plan for
19 a hotel management company. Ultimately, plaintiff registered the name Cachet,
20 merged David Laris Restaurant Company with Cachet, which at the time had 8
21 locations, and convinced Mr. Roche to buy another distressed hotel in Shanghai, and
22 then rebranded it as Cachet.

23      6. In recognition of plaintiff's unique talents and ability, and in light of his
24 having been one of the founders of defendants Cachet, plaintiff became employed by
25 defendants as President and Chief Executive Officer.  Effective April 1, 2013,
26 plaintiff's employment became subject to a written employment contract, which
27 contract was subsequently amended effective May 1, 2014 and again in May 2016.
28 Pursuant to these contracts and their amendments, copies of which are attached

FIRST AMENDED COMPLAINT FOR DAMAGES;DEMAND FOR JURY TRIAL
C:\Users\Michael J. Faber\Documents\DOCS -- C\Mirza, Alexander\Complaint--FAC.wpd

cumulatively as Exhibit 1, plaintiff was to earn a salary of $400,000 annually, with guaranteed annual increases of 4%, an annual discretionary bonus of up to 35 %, and various additional benefits. His total compensation package was valued in excess of $600,000 per year.  The term of the employment contract was to May 31, 2021 unless terminated early for "good cause" as defined in the contract.

7.  In addition to plaintiff's cash compensation, plaintiff was awarded approximately a 10% equity interest in all future profits of defendant Cachet Cayman, and was made a limited partner of said entity.

8.  Plaintiff was extremely successful in his employment, and served defendants ably and with excellence.  Over the course of the plaintiff's employment, plaintiff used his industry contacts to source and successfully procure hotel deals for Cachet starting with a 5 star, 200 room hotel in Chengdu, China. Plainitff used his longstanding industry relationships and networks in Asia to source and close 15 management contracts and leases with a Net Present Value of $290mm and $20mm annual stabilized fees for an average of 25 years.

9.  Mr. Mirza also developed hundreds of pages of detailed hotel brand standards, hotel management, centralized services and technical services agreements by modifying old templates including product, service and technology requirements for each hotel brand resulting in saving the company at least half a million dollars in start up costs.  In this regard, plaintiff also created the blueprint for a low cost technology platform to fulfill Cachet's obligations in its hotel contracts and centralized services and building a team to sign large database partnerships such as banks and airlines. The platform provided significant upside for hotel franchising and licensing as well as a booking engine for other independent boutique hotels which has become the widely adopted industry trend.

10.  Equally significant, plaintiff also recruited, and spent hundreds of hours training and developing a senior management team in China, Thailand/Southeast Asia and the U.S., building a corporate organization which was widely hailed as being

almost 50% women, with over one-third (1/3) of General Managers being women or minorities (compared to 5% for the industry). In fact, the corporate organization of over 60 people was recognized as the "Most Up and Coming Management" company in Asia in 2016.  Plaintiff is informed and believes, however, and thereon alleges, that Mr. Roche objected to plaintiff's efforts to build a diversified workforce and routinely singled out and unnecessarily criticized top women executives.

11.  In or about August 2016, plaintiff met Adam Hochfelder.  Plaintiff is informed and believes, and thereon alleges, that Mr. Hochfelder was and is a Managing Director of Real Estate Acquisitions & Development for Merchants Hospitality. Despite Mr. Hochfelder's undisputed business acumen, plaintiff is informed and believes, and thereon alleges, that Mr. Hochfelder pleaded guilty to grand larceny and scheming to defraud investors, was charged with swindling not banks, friends and family out of more than $17 million in loans and investment capital by forging documents, misrepresenting how much collateral he owned or lying about deals he was undertaking, pleaded guilty to 18 counts of grand larceny and scheming to defraud investors, and served time in prison.

12.  Notwithstanding Mr. Hochfelder's unsavory criminal history, plaintiff is informed and believes, and thereon alleges, that Mr. Roche personally invested $5 million in one of Mr. Hochfelder's business ventures, the OUT Hotel of New York City, and in return acquired a 30% ownership stake in Merchants Hospitality. Plaintiff is further informed and believes that Mr. Roche thereafter engaged in other real estate investments with Merchants, including forming Merchants/Roche Capital Partners, a dedicated real estate fund.

13.  In or about April 2017, plaintiff expressed concerns to Mr. Roche about the possibility of financial corruption by Mr. Hochfelder/Merchants, but Mr. Roche wanted to continue doing business with Mr. Hochfelder. Indeed, between April and July 2017, Mr. Roche directly negotiated joint ventures with Mr. Hochfelder involving two rounds of Merchants Investment into Cachet at a $250mm valuation

1  and the Phillipe Chow restaurant business. The second round would result in a Cachet

2  board seat for Merchants.

3       14.  By late May 2017, Cachet took over management of the OUT hotel and by

4  mid June the hotel began experiencing financial problems because Merchants was not

5  paying rent, taxes and insurance as required. As disturbing as these events were for

6  plaintiff, even more disturbing was what happened shortly thereafter.

7       15.  In mid-July, 2017, plaintiff learned that three females were pursuing

8  allegations of sexual harassment and gender discrimination against Mr. Hochfelder.

9  Plaintiff, in his role as defendants' President and Chief Executive Officer, advised

10  Mr. Roche and defendants' Human Resources advisor, Dr. Michelle Crosby, of these

11  allegations, including the identities of the women and the details of the allegations.

12  Plaintiff also advised Mr. Roche and Dr. Crosby that he had received emails and texts

13  from Mr. Hochfelder demeaning women at the New York property operations. As a

14  Human Resources executive, Dr. Crosby had vast experience in handling and

15  investigating these kinds of complaints for companies hence it was agreed that she

16  would independently investigate the allegations as required by Title VII of the Civil

17  Rights Act of 1964 and the Fair Employment and Housing Act. In addition, Dr.

18  Crosby suggested hiring experienced employment counsel to defend against the

19  allegations, if necessary. On behalf of defendants, and in the course and scope of his

20  duties to them, plaintiff authorized the retention of Thompson Coburn, and

21  specifically employment partners Mark Levinson and Arthur Silbergeld.

22       16.  Because of the sexual harassment complaints against Mr. Hochfelder, and

23  their potential liability for Cachet, plaintiff was increasingly concerned about the

24  implications for defendants of Mr. Hochfelder/Merchant's shareholder interest.

25  Hence on July 21, 2017 plaintiff sent Mr. Roche an e-mail (with a copy to Dr.

26  Crosby) stating, inter alia:

27            "Hi Robert. I am writing this confidential message to you

28            after some careful reflection and several conversations with

1    Michelle and our management team. I want to be on record

2    that I strongly believe the best approach with Adam and

3    Merchants is to have them remain only a small shareholder

4    at 2.3% and focus on execution in NYC and the Phillipe JV.

5    I do not want Adam or Merchants on our board of directors.

6    I strongly believe this would destroy more economic value

7    than it could create and that it would be toxic for Cachet on

8    a number of levels. To be candid, I believe it would be a

9    total disaster for Cachet and could ruin the company we

10   have spent almost 5 years building.I take the same position

11   as your friend Kurt Campbell: Adam's reputation and his

12   criminal past will seriously damage our ability to raise

13   capital and do deals with other developers and lenders.

14   Furthermore, from an HR perspective, what I have

15   experienced is that he is not at all suited to be part of an

16   operating company like Cachet. He is unstable, lacks

17   integrity and is toxic with people. I can't even begin to

18   imagine the number of HR lawsuits and harassment claims

19   we would face from women and minorities if he played a

20   larger role and joined the board."  (emphasis added).

21   Sadly, however, Mr. Roche rejected the email, complaining about "all the

22   drama."

23   17.  Instead of supporting the investigation into the allegations of sexual

24   harassment, Mr. Roche interfered with, and attempted to control, the investigation

25   into Mr. Hochfelder's alleged sexual harassment of the female employees.  Mr. Roche

26   went so far as to disparage plaintiff's religion, Islam, by saying that he felt "stuck in a

27   conflict between a Muslim and a Jew." Plaintiff objected to Mr. Roche's conduct

28   because he felt it vitally important to determine if defendants' female employees had

FIRST AMENDED COMPLAINT FOR DAMAGES;DEMAND FOR JURY TRIAL

been subjected to sexual harassment, and if so, to remedy the situation as required by law, not to mention being the right thing to do.  In addition, Dr. Crosby objected to Mr. Roche's interference, writing on July 22, 2017:

> "Since you hired me for my experience and expertise I am going to give you my professional opinion on what needs to happen now...With all due respect, you need to stand down.

You need to let me handle this investigation as I see fit and not tell me how to proceed...I am doing this to help protect you and your company...."

18.  Despite Dr. Crosby's and plaintiff's objections, Mr. Roche was not deterred.  On July 23, 2017, Mr. Roche persisted with his interference, demanding to see emails and text messages sent by Mr. Hochfelder.  This caused Dr. Crosby to write:

> "Robert,  I have no desire to be an adversarial situation with you over this.  You are indeed the Chairman of the Board and, as I said before, you and Alex are entitled to run your business the way you see fit...After careful consideration and another sleepless night, I have come to the decision that I wish to withdraw my involvement in this investigation and you can hire suitable counsel of your choosing or whomever else you deem appropriate to manage it, as you see fit. . . ."

19.  Because of Dr. Crosby's resignation, an outside law firm, Thompson Coburn, was authorized to retain EXTTI, a well respected workplace investigations firm, on defendants' behalf to conduct the investigation surrounding the three complaints against Mr. Hochfelder. Then, on July 28, 2017, plaintiff was contacted by yet another employee, a manager at the New York hotel, saying that she wanted to file a sexual harassment complaint against her supervisor, the OUT Hotel General Manager, Kevin Fenton. As appropriate for his role, plaintiff immediately advised the outside employment attorneys, and Cachet's General Counsel, Lei Li.

20.  Mr. Roche, concerned that competent and independent investigations might confirm that his friend, business partner, and investor, Mr. Hochfelder, had indeed engaged in sexual harassment, and thereby possibly subject defendants to liability, continued his attempts to interfere by hiring a personal attorney, Ronald Passarelli in Illinois to replace Thompson Coburn.  Mr. Passarelli similarly sought to obtain a copy of the e-mails/texts sent by Mr. Hochfelder to the victims.

21.  On or about August 5, 2017, Mr. Roche had defendants' board pass a resolution removing plaintiff from the sexual harassment investigation process. The following day, plaintiff sent an e-mail to the board members explaining that "[t]he investigation, as it pertains to Adam, is highly sensitive given Adam's financial and complex relationship with Cachet. . .Thompson Coburn is our Company counsel in this matter and provides legal guidance to the Board. . . . I encourage the Board to allow the investigation team hired by Thompson Coburn to complete its work and produce its report to me this coming week. I will then share the report with the Board . . . ."

22.  On or about August 11, 2017, Mr. Roche complained that plaintiff's insistence on a fair and independent investigation was "a battle between Muslims and Jews, and it is clear who is more rational."  The following day, August 12, 2017, defendants abruptly terminated plaintiff's employment, allegedly "for cause," but without stating any reason for the termination.  Plaintiff is informed and believes, and thereon alleges, that his termination was without cause, and that his termination was, in fact, motivated in part by his religion and his insistence on the defendants conducting a thorough, fair and honest investigation into the allegations of Mr. Roche's friend, business partner, and investor, Adam Hochfelder, as required by California and federal law.

## FIRST CAUSE OF ACTION

C:\Users\Michael J. Faber\Documents\DOCS -- C\Mirza, Alexander\Complaint--FAC.wpd

**(Retaliation – Government Code and Title VII)**

23.    Plaintiff incorporates by reference paragraphs 1 through 22 of the Introductory Allegations as though fully set forth herein.

24.    Plaintiff alleges that defendants' termination of his employment was in retaliation for initiating and following through on the investigation into complaints of sexual harassment allegedly committed by Mr. Roche's friend, business partner, and investor, Adam Hochfelder, and that said retaliation was in violation of the Fair Employment and Housing Act, Government Code §12940 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq, and was a substantial factor in causing damages and injury to plaintiff as described below.

25.    As a proximate result of the retaliatory conduct of the defendants, and each of them, plaintiff has suffered, and continues to suffer, loss of wages, bonuses, vacation pay and other special damages in an amount to be set forth at time of trial.

26.    As a further proximate result of defendants' tortious conduct as hereinbefore alleged, plaintiff was caused to become seriously and severely emotionally upset and depressed.  He has suffered, and continues to suffer, anxiety, worry, loss of appetite, loss of sleep, embarrassment, humiliation and mental anguish all to his damage and detriment in an amount unspecified at present, and which will be subject to proof at time of trial.

27.    The acts of defendants were done intentionally, willfully, oppressively, fraudulently and maliciously.  The acts complained of were performed, authorized and/or ratified by defendants' officers, directors and managing agents, thereby entitling plaintiff to punitive and exemplary damages according to proof.

28.    Pursuant to Government Code Sections 12940 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq plaintiff also has incurred attorney's fees, and seeks an award thereof.

29.    Plaintiff filed timely Complaints with the Department of Fair Employment and Housing and the Equal Employment Opportunity Commission, and

C:\Users\Michael J. Faber\Documents\DOCS -- C\Mirza, Alexander\Complaint--FAC.wpd

has been issued Right to Sue letters.  Accordingly, plaintiff has exhausted his administrative remedies under the Government Code and Title VII.

## SECOND CAUSE OF ACTION

### (Religious Discrimination)

30.    Plaintiff incorporates by reference paragraphs 1 through 22 of the Introductory Allegations as though fully set forth herein.

31.    Plaintiff alleges that defendants' termination of his employment was motivated, in part, due to the fact that he is a Muslim and was insisting on investigating allegations of sexual harassment committed by a Jewish person, and that said termination was therefore in violation of the Fair Employment and Housing Act, Government Code §12940 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq, and was a substantial factor in causing damages and injury to plaintiff as described below.

32.    As a proximate result of the retaliatory conduct of the defendants, and each of them, plaintiff has suffered, and continues to suffer, loss of wages, bonuses, vacation pay and other special damages in an amount to be set forth at time of trial.

33.    As a further proximate result of defendants' tortious conduct as hereinbefore alleged, plaintiff was caused to become seriously and severely emotionally upset and depressed.  He has suffered, and continues to suffer, anxiety, worry, loss of appetite, loss of sleep, embarrassment, humiliation and mental anguish all to his damage and detriment in an amount unspecified at present, and which will be subject to proof at time of trial.

34.    The acts of defendants were done intentionally, willfully, oppressively, fraudulently and maliciously.  The acts complained of were performed, authorized and/or ratified by defendants' officers, directors and managing agents, thereby entitling plaintiff to punitive and exemplary damages according to proof.

35.    Pursuant to Government Code Sections 12940 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq plaintiff also has incurred

10

FIRST AMENDED COMPLAINT FOR DAMAGES;DEMAND FOR JURY TRIAL
C:\Users\Michael J. Faber\Documents\DOCS -- C\Mirza, Alexander\Complaint--FAC.wpd

1   attorney's fees, and seeks an award thereof.

2      36.   Plaintiff filed timely Complaints with the Department of Fair

3   Employment and Housing and the Equal Employment Opportunity Commission, and

4   has been issued Right to Sue letters.  Accordingly, plaintiff has exhausted his

5   administrative remedies under the Government Code and Title VII.

6                    **THIRD CAUSE OF ACTION**

7           **(Wrongful Termination In Violation Of Public Policy)**

8      37.   Plaintiff incorporates by reference paragraphs 1 through 22 of the

9   Introductory Allegations as though fully set forth herein.

10     38.   At all times relevant hereto, Government Code Sections 12940 et seq.

11  and 42 U.S.C. § 2000e, et seq.  were in full force and effect and represented the

12  fundamental public policy of the State of California that employees are to be free of

13  religious discrimination and free from retaliation for reporting and investigating what

14  they reasonably believe to be sexually harassing behavior in the work place.  Plaintiff

15  contends that his termination was in violation of that fundamental public policy and

16  was a substantial factor in causing damages and injury to plaintiff as described below.

17     39.   As a proximate result of the retaliatory conduct of the defendants, and

18  each of them, plaintiff has suffered, and continues to suffer, loss of wages, bonuses,

19  vacation pay and other special damages in an amount to be set forth at time of trial.

20     40.   As a further proximate result of defendants' tortious conduct as

21  hereinbefore alleged, plaintiff was caused to become seriously and severely

22  emotionally upset and depressed.  He has suffered, and continues to suffer, anxiety,

23  worry, loss of appetite, loss of sleep, embarrassment, humiliation and mental anguish

24  all to his damage and detriment in an amount unspecified at present, and which will

25  be subject to proof at time of trial.

26     41.   The acts of defendants were done intentionally, willfully, oppressively,

27  fraudulently and maliciously.  The acts complained of were performed, authorized

28  and/or ratified by defendants' officers, directors and managing agents, thereby

entitling plaintiff to punitive and exemplary damages according to proof.

## FOURTH CAUSE OF ACTION

### (Breach of Contract)

42.    Plaintiff incorporates by reference paragraphs 1 through 22 of the Introductory Allegations as though fully set forth herein.

43.    Defendants' termination of plaintiff's employment was in breach of his contract of employment.

44.   As a proximate result of defendant's breach of contract, as herein alleged, plaintiff has suffered, and continues to suffer, loss of wages, bonuses, and other special damages in an amount to be set forth at time of trial.

## FIFTH CAUSE OF ACTION

### (Failure to Pay Wages & Waiting Time Penalties)

45.    Plaintiff incorporates the allegations of Paragraphs 1 through 22 of the Introductory Allegations as though  fully set forth herein.

46.    Defendants failed to pay plaintiff all wages due to him pursuant to his contract on the date they terminated his employment.  Defendants' failure to pay plaintiff all such wages upon termination was wilful, and plaintiff is therefore entitled to recover attorneys fees plus waiting time penalties equal to thirty days' pay pursuant to Labor Code § 203.

## SIXTH CAUSE OF ACTION

### (Failure To Indemnify Business Expenses)

47.    Plaintiff incorporates the allegations of Paragraphs 1 through 22 of the Introductory Allegations as though  fully set forth herein.

48.    In addition to all the foregoing allegations, plaintiff alleges that he had an American Express credit card which he and other executives used for legitimate expenses on behalf of defendants, and at the time of his termination said card had in excess of $100,000 on it.  Despite demands made by plaintiff and on his behalf, defendants have failed and refused to indemnify plaintiff for said expenses, leaving

C:\Users\Michael J. Faber\Documents\DOCS -- C\Mirza, Alexander\Complaint--FAC.wpd

plaintiff responsible for them, and suffering potential financial losses and impairment of his credit.

49.     Defendants' conduct in this regard is in violation of Labor Code §2802, and As a proximate result of the retaliatory conduct of the defendants, and each of them, plaintiff has suffered, and continues to suffer, special damages in an amount to be set forth at time of trial.

50.   As a further proximate result of defendants' tortious conduct as hereinbefore alleged, plaintiff was caused to become seriously and severely emotionally upset and depressed.  He has suffered, and continues to suffer, anxiety, worry, loss of appetite, loss of sleep, embarrassment, humiliation and mental anguish all to his damage and detriment in an amount unspecified at present, and which will be subject to proof at time of trial.

51.     The acts of defendants were done intentionally, willfully, oppressively, fraudulently and maliciously.  The acts complained of were performed, authorized and/or ratified by defendants' officers, directors and managing agents, thereby entitling plaintiff to punitive and exemplary damages according to proof.

WHEREFORE, plaintiff prays judgment as follows:

1.     Damages for lost wages and other special damages, including waiting time penalties and indemnification for business expenses, in an amount to be set forth at time of trial;

2.     Damages for plaintiff's emotional pain and suffering in an amount to be set forth at time of trial;

3.     Punitive and exemplary damages according to proof;

4.     Attorney's fees and costs of suit in amounts to be set forth at time of trial; and

/ / /

/ / /

FIRST AMENDED COMPLAINT FOR DAMAGES;DEMAND FOR JURY TRIAL

C:\Users\Michael J. Faber\Documents\DOCS -- C\Mirza, Alexander\Complaint--FAC.wpd

1     5.     For such other and further relief as the Court may deem just and proper.

2

3   DATED:  October 2, 2017

4

5                                               /s/
                                        MICHAEL J. FABER
                                        Attorney for Plaintiff
6                                       ALEXANDER MIRZA

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR DAMAGES;DEMAND FOR JURY TRIAL

C:\Users\Michael J. Faber\Documents\DOCS -- C\Mirza, Alexander\Complaint--FAC.wpd

1

## **JURY TRIAL DEMAND**

2

Plaintiff hereby demands trial by jury.

3

4

DATED:  October 2, 2017

5

6                                                    /s/
                                        MICHAEL J. FABER
7                                       Attorney for Plaintiff
                                        ALEXANDER MIRZA

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

FIRST AMENDED COMPLAINT FOR DAMAGES;DEMAND FOR JURY TRIAL

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

Effective as of April 1, 2013, the parties to this agreement (the "Agreement") Alexander Mirza (the "Executive"), and Cachet Hotel Group Limited, an entity created and existing under the laws of Hong Kong (the "Company") hereby amend and restate the previously executed Employment Agreement between executive and Valencia Management Inc. by deleting it in its entirety and substituting the following:

The Company wishes to employ the Executive, and the Executive wishes to serve the Company, as its President and Chief Executive Officer. As such, this Agreement sets forth the terms and conditions that will govern the Executive's employment with the Company.

In consideration of mutual promises and covenants set forth herein, the sufficiency of which is hereby acknowledged, the Company and Executive agree as follows:

1.     Employment.

During the term of the Executive's employment under this Agreement, the Company shall employ the Executive, and the Executive shall serve the Company and its direct and indirect subsidiaries and affiliates (collectively, the "Companies") as President and Chief Executive Officer, with those duties and responsibilities generally associated with that position as may be reasonably assigned to him by the Chairman of the Board of Directors of the Company (the "Chairman"). See Exhibit A attached hereto for a non-exhaustive list of responsibilities for which Executive will be responsible. The Executive shall report to the Chairman, shall devote all of his business time, ability and attention to the performance of his duties for the Companies, shall use commercially reasonable efforts to further the interests of the Companies, and shall not directly or indirectly engage in any other business activity, except with the Company's prior written consent. The General Manager of the Company's existing hotel in Shanghai shall report to the Executive, and all future hotel businesses of the Company shall also report to the Executive. The Executive shall be appointed as a member of the Board of Directors of the Company (the "Board") as soon as practicable following the Effective Date (as defined in Section 2 hereof).

The Executive's office and principal place of business shall be located at Hong Kong, SAR and such other non United States locations as approved by the Chairman. The Executive's office and principal place of business shall be located at Shanghai, China. At all times during the term of this Agreement, the Executive shall adhere to all of the Company's policies, rules and regulations governing the conduct of its employees.

2.     Term of Employment.

The term of the Executive's employment under this Agreement shall commence on April 1, 2013 (the "Effective Date") and shall continue until the fifth

anniversary of the Effective Date unless terminated pursuant to Section 5 or 6.

3.      Compensation.

3.1     Salary.  As compensation for the Executive's services under this Agreement, the Executive shall be entitled to a salary at the rate of $350,000 a year, payable in equal installments in accordance with the Company's customary payroll practices for its employees, but not less often than monthly. Such base salary rate shall be subject to periodic review, with such review to occur not less often than annually.

3.2     Cash Incentives.  In addition to the Executive's base salary, and so long as the Executive is currently employed when such incentives are due and payable to the Company except as set forth in Section 6 with respect to the severance payment, the Executive will be eligible to receive the incentive compensation described herein beginning with respect to the remaining portion of calendar year 2013 (i.e., on a prorated basis for 2013): (i) annual discretionary performance-based incentive pay in the form of a target bonus equal to 40-50% of the Executive's then-base salary based on the performance benchmarks and determination mechanisms similar to those used for other senior executive team leaders.

3.3     Equity Incentive.  The Company shall develop and adopt an equity-based incentive compensation plan for the Executive as soon as practicable following the Effective Date. The plan shall include the right of the Executive to receive the following equity interest: restricted stock equal to (i) 5% of Company equity; and, (ii) 5% of the equity in VM Granada Holdings, Ltd., such stock to be subject to the same anti-dilution protection as that of HG Echo Valley (as defined in Section 6.3(b)(iv). For the avoidance of doubt, the stock described in this Section 3.3 shall be fully vested upon grant and shall not be subject to forfeiture, whether by reason of the Executive's termination of employment or otherwise."

3.4     Taxes.  Each party is responsible for its own taxes associated with the business relationship, and will each fulfill its own responsibilities for any taxes imposed by governments or governing authorities, and related accounting or audit requirements arising out of, as a result of, incidental to, or in connection with obligations under this Agreement. For the avoidance of doubt, all of Executive's tax-related responsibilities to relevant tax authorities are entirely his responsibility, including any income tax which may be payable on the compensation paid hereunder.

4.      Reimbursement of Expenses; Fringe Benefits.

4.1     Expenses.  The Company shall reimburse (or shall cause one of the other Companies to reimburse) the Executive, in accordance with the Company's policies, for all approved reasonable and necessary out-of-pocket business expenses, including business class travel on all approved travel where business class is available, incurred by the Executive in connection with the performance of the Executive's duties under this Agreement in accordance with Company approved budgets. The Executive shall

furnish to the Company documentary evidence of each such expense in the form reasonably required to comply with the Company's policies and all tax statutes and regulations applicable to the substantiation of the expense as a tax deduction.

4.2 Benefits. The Company does not provide health and welfare benefits, retirement plans, death and disability benefits or others forms of executive compensation or benefits except as specifically set forth in this Agreement.

4.3 Office and Company-Provided Resources; Expatriate Package. The Executive will be provided a dedicated office location in Shanghai; a dedicated Chinese-speaking assistant in Shanghai (chosen by the Executive), and the shared use of a driver in Shanghai. The Executive shall also be provided with use of a one-bedroom furnished corporate apartment, sourced by the Company, on a turnkey basis.

5. Disability or Death.

5.1 Disability. If, as the result of any physical or mental disability, the Executive shall fail or be unable to perform the essential functions of his position for a total of 30 consecutive days or for a total of 60 days in any twelve-month period, the Company may, by notice to the Executive, terminate his employment under this Agreement as of the date of the notice.

5.2 Payments on Disability. If the Executive's employment is terminated under Section 5.1, the Company shall pay to the Executive, in full discharge of all obligations to the Executive, (a) the accrued amount of salary and incentive compensation, if any, payable or issuable to the Executive through the date of termination of employment, and (b) the amount of outstanding expense reimbursements due to the Executive under Section 4.1 through the date of termination of employment, in accordance with the terms of this Agreement.

5.3 Payments on Death. The Executive's employment under this Agreement shall be terminated upon the Executive's death and the Company shall pay to the Executive's estate, in full discharge of all obligations to the Executive, (a) the accrued amount of salary and incentive compensation, if any, payable or issuable to the Executive through the date of termination of employment, and (b) the amount of outstanding expense reimbursements due to the Executive under Section 4.1 through the date of termination of employment, in accordance with the terms of this Agreement.

6. Termination.

6.1 Termination With or Without Cause. The Executive is engaged on an "at will" basis and can be terminated at any time at the Company's sole and unfettered discretion. During the first twelve months following the effective date of this Agreement (the First Year), if the Executive is terminated without Cause, or if he leaves for Good

Reason, the Company shall pay to the Executive, in full discharge of its obligations to the Executive, the accrued amount of salary, if any, payable or issuable to the Executive through the effective date of termination of employment, the amount of outstanding expense reimbursements due to the Executive under Section 4.1, and the amount of salary he would have received for the remaining months of the First Year. If at any time the Executive's employment under this Agreement is terminated by the Company for Cause, or if he leaves without Good Reason, the Company shall pay to the Executive, in full discharge of its obligations to the Executive through the effective date of termination of employment and the amount of outstanding expense reimbursements due to the Executive under Section 4.1. Upon termination for any reason, all of Executive's other positions with the Company, VM Granada, HG Echo Valley or their affiliates shall immediately terminate, including any board membership and directorships, and Executive shall immediately resign such positions.

6.2.  Executive's Right to Terminate in the event of Change in Control. If there is a Change in Control of the Company at a valuation for the whole Company of more than $10,000,000 USD, the Executive shall have the right to terminate employment within the 90 day period thereafter and receive a lump sum payment equal to the product of three and his then current annual salary.

6.3  Definitions.  As used in this Agreement:

(a) the term "Cause" shall mean: (i) willful misconduct that is materially injurious to any of the Companies or any of their respective employees, or that materially and adversely affects the assets, liabilities, business, reputation or prospects of any of the Companies; (ii) breach of fiduciary duty to the Companies involving personal profit; (iii) the Executive's intentional refusal to perform his duties under this Agreement in a competent manner; (iv) fraud, embezzlement or other misappropriation by the Executive of funds or property of any of the Companies or any other criminal act committed during the Term against the Companies involving dishonesty or willful misconduct intended to injure the Companies (whether or not a felony); (v) the conviction of the Executive, or his plea of no contest to, a felony other than in connection with a motor vehicle; (vi) the conviction of the Executive, or his plea of no contest to, a crime involving any financial impropriety or that would materially interfere with the Executive's ability to perform the services required under this Agreement or otherwise would be materially injurious to any of the Companies; (vii) substance abuse by the Executive which is repeated after written notice to the Executive identifying such abuse; or, (viii) the breach by the Executive in any material respect of his obligations under this Agreement (including, but not limited to, any of his obligations under Section 7), provided, however, that any act or omission described in clauses (i), (ii), (iii) or (viii) will not constitute "Cause" if it is susceptible to cure and if it is cured by the Executive within five days following the Executive's receipt of notice from the Company; provided that such five-day (5) period shall be extended to thirty (30) days if in the Company's reasonable judgment such breach is not reasonably susceptible of cure within five (5) days and the



Executive has commenced to cure and is then proceeding with diligence to cure such breach.

(b) The term "Good Reason" shall mean (i) a breach by the Company of any provision of this Agreement which, after written notice to the Company, is not cured within sixty (60) days; or (ii) a material adverse change in Executive's job duties or responsibilities, including or a material reduction in Executive's salary, other than a reduction of 15% implemented to all other similarly situated senior-level executives; (iii) Executive no longer reports to the Chairman of the Board); (iii) failure to pay any compensation hereunder when due which, after written notice to the Company, is not cured within ten (10) business days; or (iv) Robert W. Roche or his nominee is no longer the Chairman of the Board of the Company, or, HG Echo Valley, LLC (or its members, subsidiaries, and affiliates, or any other entity which is in control of, controlled by or under common control with it or one or more of its members or the family members of such members, or the members of the Robert W. Roche Family) (collectively "HG Echo Valley") ceases to be the Company's single largest shareholder (a "Change of Control").

6.4    Release.    Notwithstanding anything to the contrary in this Agreement, the Executive shall not be entitled to receive any post-employment compensation or benefit pursuant to this Section 6 or otherwise hereunder, unless, prior to receipt of any such compensation, benefit, the Executive executes and delivers to the Company (and any other applicable subsidiary of the Company) a general release of claims, in substantially the form attached hereto as Exhibit B, under which the Executive releases and discharges each of them and each of the other Companies and each of their respective affiliates, and their respective shareholders, members, officers, directors, managers, partners, employees and agents, from any claims and causes of action arising out of the Executive's employment or termination of the Executive's employment, but excluding claims and causes of action relating solely to the Company's obligations to make payments or provide benefits after termination of employment pursuant to the express terms of this Agreement, exercisable by the Executive within a 90-day period from the date of termination of employment.  If the release revocation period spans two years, then any such payments will be made in the second of those two years.

7.    Non-Solicitation and Related Covenants.

7.1    Non-Solicitation.

(a) During the Executive's employment by any of the Companies (whether or not under this Agreement) and for a period of twelve months thereafter (the "Restricted Period"), the Executive shall not, directly or indirectly, on his own behalf or on behalf of any other person or entity, solicit for employment (or for consulting) or hire, or otherwise encourage the resignation of, any person who was an employee, officer or director of any of the Companies at any time during the twelve month period preceding the date of such solicitation, encouragement or hiring.

(b) During the Restricted Period, the Executive shall not, directly or indirectly, solicit or encourage any customer, client, joint venture or other business partner, investor, lender, management company, or supplier of any of the Companies to discontinue or diminish his or its business relationship with any of the Companies.

7.2    Confidentiality. The Executive shall not at any time hereafter disclose to anyone (except in connection with the performance of his services for the Company or any of its subsidiaries), or use in competition with any of them, any information with respect to any confidential, proprietary or secret aspect of the business of any of the Companies and shall otherwise comply with all aspects and provisions of the Confidentiality and Inventions Agreement executed by the Executive and attached as Exhibit C hereto. In the event of any conflict between the terms and conditions of this Agreement and the Confidentiality and Inventions Agreement, the Confidentiality and Inventions Agreement shall control.

7.3    Competition with the Company's Brand and Branding Strategy. During the Executive's employment by any of the Companies (whether or not under this Agreement) and for a period of twelve months thereafter, the Executive shall not, directly or indirectly, on his own behalf or on behalf of any other person or entity, take any steps in furtherance of attempts to promote, market, build, open, manage or operate any "green" or "carbon neutral" hotels, motels, inns or resorts which compete with the Urbn brand.

7.4    Enforcement, Survival, etc.

(a) The covenants in this Section 7 are for the benefit of, and may be enforced by any of the Companies. The Executive acknowledges that the remedy at law for breach of the provisions of this Section 7.3 will be inadequate and that, in addition to any other remedy any of the Companies may have, they shall be entitled to an injunction restraining any breach or threatened breach, without any bond or other security being required and without the necessity of showing actual damages.

(b) If any court construes any covenant in this Section 7 to be unenforceable in any respect, the court may reduce the duration or area to the extent necessary so that the provision is enforceable, and the provision, as reduced, shall then be enforceable.

(c) The rights of the Company under this Section 7 may be assigned to any purchaser or other acquiror in connection with any transaction that results in a Change of Control, in which event the provisions of this Section 7 shall continue to be binding upon the Executive and shall be enforceable by the purchaser or other acquiror.

(d) The covenants contained in Section 7 shall survive the termination of the Executive's employment (regardless of the reason for termination).



8.    Miscellaneous.

8.1    Definition.    As used in this Agreement, the term "affiliate" means, with respect to any person or entity, any person or entity directly or indirectly controlled by, controlling, or under common control with, that person or entity.

8.2    Headings.    The Section headings of this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.

8.3    Notices.    All notices and other communications under this Agreement shall be in writing and shall be deemed given when delivered personally or mailed by registered mail, return receipt requested, to the parties at their respective addresses set forth above (or to such other address as a party may have specified by notice given to the other party pursuant to this provision).

8.4    Severability.    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

8.5    Waiver.    Either party may waive compliance by the other party with any provision of this Agreement. The failure of a party to insist on strict adherence to any term of this Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.  No waiver of any provision shall be construed as a waiver of any other provision. Any waiver must be in writing.

8.6    Assignment.    Neither party may assign any of its or his rights or delegate any of its or his duties under this Agreement without the prior written consent of the other party, except the Company may assign its rights under this Agreement to the purchaser or surviving company in connection with a Change in Control.  Any assignment or delegation in violation of this prohibition shall be void.

8.7    Governing Law; Submission to Jurisdiction; Arbitration.

(a) This Agreement shall be governed by and construed in accordance with the law of the State of Illinois applicable to agreements entered into in Illinois. Any dispute, controversy, claims or differences of any kind whatsoever arising out of or in connection with this Agreement shall be resolved exclusively through arbitration administered by the Hong Kong International Arbitration Centre in Hong Kong which shall be conducted in accordance with the then effective ICC Rules.

(b) Notwithstanding anything to the contrary in Section 8.7(a), either party shall be entitled to seek injunctive relief from a court of competent jurisdiction to enforce or resolve a question regarding enforcement of the provisions of Section 7 of this Agreement.  For this purpose, each of the parties to this Agreement



submits to the jurisdiction of the courts of the State of Illinois and the United States District Court for the Northern District of Illinois, including, but not limited to, the in personam and subject matter jurisdiction of those courts, waives any objection to such jurisdiction on the grounds of venue or forum non conveniens, the absence of in personam or subject matter jurisdiction and any similar grounds, consents to service of process by mail (in accordance with Section 8.3 or any other manner permitted by law) and irrevocably agrees to be bound by any judgment rendered thereby in connection with this agreement. These consents to jurisdiction shall not be deemed to confer rights on any person other than the parties to this Agreement.

8.8 **Entire Agreement; No Oral Change.** This Agreement, together with the Confidentiality and Inventions Agreement, contain, and are intended as, a complete statement of all the terms of the arrangements between the parties relating to the subject matter hereof and thereof, supersede any previous agreements and understandings between the parties, and cannot be changed or terminated except by an agreement in writing signed by both parties.

8.9 **Execution in Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute a single document. Delivery of an executed counterpart of this Agreement by facsimile or .pdf/e-mail copy will be deemed as effective as delivery of an originally executed counterpart.

9. **Supersedes Prior Agreement.**

This Agreement supersedes and replaces the employment agreements previously executed by Executive with Acorn Composite Corporation and with Valencia Management Inc., which agreements the parties agree are void and of no force and effect.

**Valencia Management Ltd.**

By: _____
Benjamin D. Johnson, Director

**Cachet Hotel Group Limited**

By: _____
Benjamin D. Johnson, Director

_____
Alexander Mirza

## EXHIBIT A

1. Pursuant to contractual arrangement between the Company and VM Granada, the owner of the hotel IP, developing Urbn, r. hotels, Cachet, Savant (and eventually other) hotel brands internationally through brand management, licensing, franchising and JV agreements, focusing initially in China, Southeast Asia, India and eventually worldwide including hotels, resorts, service apartments, residences, timeshares and other multi-use real estate developments.

2. Pursuant to contractual arrangement between the Company and VM Granada, the owner of the hotel IP, developing food and beverage brands, including Laris branded restaurants, newly developed or acquired restaurant brands, celebrity chefs, destination bars and nightclubs internationally through licensing, management, JVs and other agreements in China (initially), and eventually India, other Asia, MENA and the Americas.

3. Developing a centralized services fee business including a Cachet branded hotel portal encompassing hotel, restaurant and travel distribution and loyalty partnerships that support both owned and affiliated hospitality properties internationally.

4. Other duties as assigned to help support overall hotel growth and strategic development consistent with those of a Chief Executive Officer.

EXHIBIT B AND EXHIBIT C to follow

9

**EXHIBIT C**

**CONFIDENTIALITY & INVENTIONS AGREEMENT**

In consideration of the undersigned Executive's appointment and/or continued appointment with [                    ](the "Company"), Executive agrees as follows:

1.    Confidentiality.

(a)    Executive agrees to keep secret and confidential, and will not (i) except for purposes of carrying out any duties as an employee of the Company as expressly authorized or directed by an officer of the Company, disclose, disseminate, publish or transfer to any person, corporation, firm, or other entity, either during Executive's appointment with the Company (the "Appointment Period") or at any time after the termination thereof, (ii) use in Executive's subsequent business activities or employment, without the express written authorization of the Company, or (iii) reproduce in any manner, or remove from the Company or Executive's work location any proprietary and confidential information of the Company (hereinafter referred to as "Confidential Information").

(b)    Such Confidential Information includes, without limitation, the identity of the Company's Clients (as defined in Section 15 below), Client lists, Client contracts, particular needs of each Client, the manner in which business is conducted with each Client, any past or present business information, trade secret, innovations, inventions, discoveries, improvements, research or test results, data, marketing plans, business plans, operational manuals or methods, price lists, strategies, forecasts, unpublished financial information, budgets, projections, software, techniques, designs, processes, formulas, developments or experimental work, work in process, scripts, treatments, outlines, screenplays, options, creative ideas, or any other secret or confidential matter relating to the projects, financing, concepts, investments, market strategies, tax planning documents, products, services, investors, customers, employees or officers of the Company (including identifying information, salaries, benefits, responsibilities and relative abilities), investment returns or fees, costs, pricing, suppliers, sales, or business affairs of the Company, as well as all information that has or could have commercial value or other utility in the business in which the Company or its Clients are engaged or in which they contemplate engaging and which the unauthorized disclosure could be detrimental to the interests of the Company or the Clients, whether or not such information is identified as Confidential Information by the Company or its Clients. Executive acknowledges that the Company has received and in the future will receive from third parties (including, without limitation, Clients) confidential or proprietary information ("Third Party Information") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it for only certain limited purposes, including, without limitation, names, contact information, credit card information, personally identifiable information, and other personal, non-public information about the Company's Clients. Executive agrees that any such Third Party Information shall be included within the term "Confidential Information" for all purposes under this Agreement. Executive agrees to take all precautions reasonably necessary to prevent the unauthorized use, disclosure, or dissemination of Confidential Information both during the Appointment Period and at any time after the termination thereof.

2.    No Conflict.    Executive acknowledges that Executive has no other agreements, relationships or commitments to any other person or entity that conflict with Executive's

Obligations to the Company under this Agreement. Executive will not disclose to the Company, or use, or induce the Company to use, any proprietary information or trade secrets of others, including, without limitation, client lists or client data. Executive represents and warrants that Executive has returned all property and confidential information belonging to all prior employers.

3.      Inventions. Executive agrees to promptly disclose in writing to the Company any and all works of authorship (including, without limitation, any script, screenplay, treatment, story, outline, or development project) and inventions, discoveries, developments, improvements, designs, ideas, innovations, inventions, formulas, processes, techniques, know how, and data (collectively, "Inventions") that he may conceive, discover, develop, learn or make during his or her appointment with the Company, whether such is made solely or jointly with others, whether or not patentable or registerable under copyright or similar statutes, and whether or not such conception, discovery or making involves the use of the Company's time, facilities, equipment or personnel (such Inventions that he or she may conceive, discover, develop, learn or make during his or her work with the Company, collectively, "Company Inventions"). Executive acknowledges and agrees that any and all such Company Inventions are "works for hire" under applicable law, and all right, title and interest therein shall belong to the Company. Executive further agrees to assign, and does hereby assign, to the Company all right, title and interest in and to any and all such Company Inventions and agrees to execute all documents deemed necessary or desirable by the Company in connection therewith, including patent and/or copyright assignments, and to cooperate both during and after her work with the Company, at the Company's expense, in all further actions deemed necessary or desirable to confirm, register, protect or enforce the Company's rights therein.

In the event the Company is unable for any reason, after reasonable effort, to secure Executive's signature on any document needed in connection with the actions specified in the preceding paragraph, Executive hereby irrevocably designates and appoint the Company and its duly authorized officers and agents as Executive's agent and attorney in fact, which appointment is coupled with an interest, to act for and in Executive's behalf to execute, verify and file any such document and to do all other lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by Executive. Executive hereby waives and quitclaims to the Company any and all claims, of any nature whatsoever, which Executive now or may hereafter have for infringement of any Company Inventions assigned hereunder to the Company.

4.      Return on Termination; Non-Disparagement.  In the event of termination (voluntary or otherwise) of appointment with the Company or on demand at anytime prior thereto, Executive agrees to deliver promptly to the Company all Confidential Information and Inventions, whether prepared by Executive or otherwise coming into his possession or control relating to any product, business, work, customer, supplier, or other aspect of the Company. This obligation shall include the return of any materials, whether written, electronic or in any other form, including any summaries, copies, excerpts, notes or memoranda containing or relating to any Personal Information, Confidential Information or Inventions. Executive agrees that, both during the Appointment Period and at all times thereafter, Executive shall (i) refrain from making any disparaging remarks about the businesses, services, venues, employees, representatives, members, officers, managers or other personnel of the Company or its Clients and (ii) not take any action or make any statements that are intended or should reasonably be expected to discredit, demean, or have a material adverse effect on the Company or its Clients.

5.      Further Acts.  Executive agrees that, both during the Appointment Period and at all times thereafter, Executive will sign all papers, give evidence and testimony, and, at the Company's expense, perform all acts which, in the Company's opinion, are necessary, proper or expedient to carry out and fulfill the purposes and intents of this Agreement.

AL

BS

under common control with [     ] or one or more of its members or the family members of such members, and the members of the Roche Family. Any and all such entities and individuals shall be entitled to enforce the rights of the Company hereunder. Should Executive be employed by or transferred to a successor, or to a member, subsidiary, affiliate, or other related entity, this Agreement shall continue in full force and effect as part of the terms of Executive's appointment.

13.    Clients Defined.   All references herein to the "Clients" shall mean and refer to any persons or entities (i) with whom the Company invests, or proposes to invest, or investigates for the purpose of deciding whether to invest, money or other property (whether as equity or debt), (ii) for whom the Company provides, or proposes to provide, goods or services (including, without limitation, any prior, current or prospective customer or guest of any hotel, restaurant, bar, nightclub or other venue that is owned, operated, managed or controlled by the Company) or (iii) from whom the Company or Executive obtains information in connection with the operation of the Company's business.

14.    Governing Law.   This Agreement will be governed by and construed according to the laws of the State of Illinois, us such laws are applied to agreements entered into and to be performed entirely within Illinois between Illinois residents. Executive hereby expressly consents to the personal jurisdiction of the state and federal courts located in Chicago, Illinois for any lawsuit filed there against Executive by Company arising from or related to this Agreement.

Date:  Effective as of

Company

By:_____

Its:_____


Date:  Effective as of

Executive

Execution Copy

# FIRST AMENDMENT

## TO

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

This First Amendment to Amended and Restated Employment Agreement ("First Amendment") is made and entered into as of May 1, 2014 ("Execution Date"), by and among Cachet Hotel Group Limited (HK) ("Company"), Cachet Hotel Group Limited Cayman L.P. ("Cachet Cayman"), and Alexander Mirza ("Executive").

A.  Executive is currently employed by the Company as the Company's President and Chief Executive Officer pursuant to that certain Amended and Restated Employment Agreement, dated as of April 1, 2013 ("Agreement").

B.  The Company is a wholly-owned subsidiary of Cachet Cayman.

C.  Executive and the Company now desire to make certain amendments to the Agreement and Cachet Cayman desires to become a party to the Amendment for the limited purposes set forth below.

NOW, THEREFORE, intending to be legally bound, the Company, Cachet Cayman and Executive hereby agree as follows:

1.  The Agreement is hereby amended as of the Execution Date as follows:

a.  The first sentence in Section 1 is deleted in its entirety and replaced by the following new sentence:

"During the term of Executive's employment under this Agreement, the Company shall employ the Executive, and the Executive shall serve the Company and Cachet Cayman, and their respective direct and indirect subsidiaries (collectively, the "Companies"), as President and Chief Executive Officer, with those duties and responsibilities generally associated with that position as may be reasonably assigned to him by the Chairman of the Board of Directors of Cachet Cayman (the "Chairman")."

b.  Section 1 is amended by the insertion of the following sentence at the end thereof.

"The foregoing notwithstanding, Executive shall be authorized to serve in the position of Executive Chairman of Cachet World (an entity under formation) and such service shall not be deemed a violation of this Section 1 or Section 7.3. The Company acknowledges that (i) following its formation Cachet World intends to grant Executive a ten percent (10%) equity interest in Cachet World, with five and one-half percent (5.5%) being vested on the grant date and an additional one and one-half percent (1.5%) to vest on each of the next three anniversaries of the grant date and (ii) Cachet World may in the future separately compensate Executive for his services and agrees that Executive's receipt of such equity rights and other compensation shall not be deemed a violation of this Section 1.

c.  Section 3.2 is deleted in its entirety and replaced by the following new provision:

"3.2  **Cash Incentive.** In addition to Executive's base salary, and so long as Executive is currently employed when such incentives are due and payable by the Company, except as set forth in Section 6 with respect to Executive's right to severance, the Executive will be eligible to receive incentive compensation in the form of annual discretionary performance based pay with a target bonus opportunity of 50% of Executive's then base

salary. The actual amount of the incentive compensation for a year, if any, shall be determined by the Board of Directors of the Company based on Executive's performance against goals and benchmarks established by the Board from time to time."

    d.  Section 3.3 is deleted in its entirety and replaced by the following new provision:

    "3.3   Equity Incentive. (a) As of the Execution Date, Cachet Cayman has granted to Executive a ten percent (10%) interest in the future profits of Cachet Cayman ("Executive Interest") and Executive has become a limited partner of Cachet Cayman and has executed and become a party to the Amended and Restated Exempted Limited Partnership Agreement of Cachet Cayman ("LPA"). The Executive Interest is intended to be a "profits interest" for U.S. federal income tax purposes and the receipt of the Executive Interest is intended not to be a taxable event under current Internal Revenue Service guidance.

    (b) The grant of the Executive Interest shall be deemed for all purposes to completely and fully satisfy any and all obligations of the Company to provide equity based incentive compensation to Executive either under Section 3.3 of this Agreement as was in effect on April 1, 2013 or otherwise.

    (c) Within twenty (20) days of the Execution Date, Executive shall provide the Company with a copy of a completed election under Section 83(b) of the Internal Revenue Code of 1986, as amended ("Code") with respect to the receipt of the Executive Interest and shall timely (within thirty (30) days of the Execution Date) file such election with the Internal Revenue Service and notify the Company of such timely filing.

    (d) Five and one-half percent (5.5%) of the Executive Interest shall be vested on grant and an additional one and one-half percent (1.5%) shall vest on January 1, 2015, January 1, 2016, and January 1, 2017, with the full ten percent (10%) Executive Interest being fully vested on January 1, 2017. The Executive Interest shall also be deemed to be fully vested (including any unvested portion) upon Executive's Termination by the Company without Cause or by Executive for Good Reason or upon the occurrence of a Change in Control, a Significant Capital Event, or Liquidation of Cachet Cayman. Except as expressly described above, any unvested portion of the Executive Interest on the date of Termination shall be forfeited and cancelled.

    (e) From and after the Execution Date, Net Profit and Net Loss (both as defined in the LPA) shall be allocated to Executive as if the Executive Interest were fully vested. However, in the event that as of the date of Executive's Termination the Executive Interest is not fully vested, Executive's Capital Account shall be adjusted to reflect only the Net Income that would have been allocated to Executive's Capital Account had Net Income been allocated based on the vested portion of the Executive Interest at the time of such allocation. To the extent that this adjustment results in Executive's Capital Account having a negative balance, Executive shall pay to Cachet Cayman the amount necessary to eliminate such negative Capital Account balance within thirty (30) days of Executive's receipt of written notice from the Company setting forth the repayment amount. For the avoidance of doubt, Executive shall not be required to repay to the Company an amount in excess of the aggregate Distributions (as defined in the LPA) made to Executive with respect to the Executive Interest.

    (f) The following examples illustrate the operation of paragraph (e) above:

    (i) The Company has a loss in 2014 and no allocation is made to Executive's Capital Account. Executive's Capital Account is allocated $1,000

4829-1376-8984.9

of Net Income for 2015 and Executive receives a Tax Distribution of $400 that reduces his Capital Account to $600. The Executive voluntarily resigns without Good Reason at the end of 2015 and the Executive Interest is redeemed pursuant to the terms of the LPA in 2016. Pursuant to paragraph (d) above, the adjustment to Executive's Capital Account is a reduction of $300.00 [the amount by which the allocation he received based on an assumed 10% profits interest ($1,000) exceeds the allocation he would have received based on his vested interest at the time ($700)]. Because his Capital Account balance is positive after the paragraph (d) adjustment, Executive has no repayment obligation under paragraph (d) above.

(ii) Executive's Capital Account is allocated $1,000 for 2014, $1,500 for 2005 and $2,500 for 2016. Executive receives Tax Distributions of $400, $600, and $1,000 respectively that reduce his Capital Account to $3,000 at the end of 2016. Executive is fired for Cause late in 2016 when the Executive Interest is 8.5% vested. Pursuant to paragraph (d) above, the Capital Account adjustment is a reduction of $1,125 ($450 for 2014, $300 for 2015, and $375 for 2016). Because his Capital Account balance is positive after the paragraph (d) adjustment, Executive has no repayment obligation under paragraph (d) above.

(iii) Assume the same facts as in (ii) above, except that Executive received an additional $2,500 in Distributions so that at the time of his Termination his Capital Account balance was $500. After making the paragraph (d) adjustment of $1,125, Executive's Capital Account balance would the ($625) and Executive would have a repayment obligation of $625 under paragraph (d).

(g) Following Executive's Termination for any reason, all or any portion of the vested portion of the Executive Interest is subject to redemption by Cachet Cayman in accordance with the terms of the LPA. However, as permitted by Section 9.2 of the LPA, if Executive's Termination occurs on or after the second anniversary of the Execution Date and Cachet Cayman exercises its call right under such Section 9.2 with respect to all or any portion of the Executive Interest, the Fair Market Value of the Units subject to such call shall be determined by a Qualified Independent Appraiser in accordance with the provisions of the LPA.

(h) Executive's rights to receive allocations of the profits, losses, gains, deductions and credits of Cachet Cayman and Distributions from Cachet Cayman shall be governed by the LPA. Pursuant to the LPA, Executive shall receive a special profit allocation on liquidation in an amount equal to ten percent (10%) of the value of the assets deemed contributed to Cachet Cayman upon its formation, which preference shall be second only to the preference of the Class A Limited Preferred Unit Holders with respect to their Unreturned Capital.

(i) Upon the occurrence of a Qualifying Sale, Executive shall have the right, for a period of thirty (30) days following the closing of such Qualifying Sale, to require the Company to purchase from Executive the Equivalent Percentage of the vested portion of the Executive Interest ("Put Right") for Full Value. If Executive exercises the Put Right, the Company shall purchase such portion of the Executive Interest by paying the purchase price to Executive in a lump sum within thirty (30) days after receiving notice of Executive's exercise of the Put Right. In exchange for such payment, Executive shall execute and deliver

3

to the Company such representations, warranties, consents, certificates, assignments or other documents as the Company may reasonably request in order to fully convey to the Company full right, title and interest in the Equivalent Percentage of the Executive Interest free of all liens, encumbrances and other claims.

e. Section 3.4 is renumbered as Section 3.5 and new Section 3.4 is added to the Agreement to read as follows:

"Cachet World Equity Incentive Matters It is the intention that Cachet World shall be formed as an independent company and not as a subsidiary of Cachet Cayman (and that Cachet Cayman will not have an equity interest in Cachet World). Cachet World intends to grant Executive and other key Cachet World employees interests in Cachet World that are similar to, and on similar terms to, the Class B Limited Units granted by Cachet Cayman to Executive and other key Cachet Cayman employees. The specific equity percentages and vesting schedules for the equity interests that Cachet World intends to grant are reflected on Exhibit B to this First Amendment. The vesting period with respect to Executive's grant shall commence on the Execution Date. The vesting period with respect to other grants shall commence on the date that the applicable employee signs a Class B Limited Unit Grant Agreement with Cachet Cayman. Executive's equity percentage and vesting schedule as reflected on Exhibit B shall not be changed without the consent of Cachet Cayman and Executive."

f. Section 4.3 is amended by the addition of the following at the end of such section.

"The Company shall provide Executive with professional assistance in connection with the preparation of Executive's Hong Kong, Chinese and United States income tax returns, the cost of which shall not exceed US$5,000 per annum.

g. Section 6.1 amended in its entirety to read as follows:

"6.1    Termination. (a) The Grant of the Executive Interest shall not create any right of Executive to continue in employment with the Company. Executive's employment by the Company shall be deemed to be "at will" and the Company reserves the right to terminate such employment at any time in its sole and unfettered discretion with or without prior notice. Executive shall also have the right to terminate his employment by the Company for any reason with ninety (90) days prior written notice. This Agreement shall terminate automatically upon such termination of employment for any reason, including death, except as otherwise expressly provided herein.

(b) In the event of a Termination by the Company other than for Cause or by Executive for Good Reason (with respect to which Section 6.1(c) below does not apply), in addition to any accrued but unpaid salary or other compensation or expense reimbursement payable to the Executive as of the date of Termination, the Company shall also pay the Executive an amount equal to twelve (12) months' base salary at the rate in effect on the date of Termination. Such payment shall be made in twelve equal monthly installments commencing on the first regular payroll date that falls at least thirty (30) days after the date of Termination. In the event of a Termination by the Company other than for Cause or by Executive for Good Reason, Executive shall also be eligible to receive any incentive compensation awarded to him pursuant to Section 3.2(a) with respect to the calendar year in which the Termination occurs, but shall not be eligible to receive incentive compensation for any subsequent calendar year.

4

(c) In the event of a Termination by Executive for Good Reason (as described in Section 6.3(b)(iv) below) within 90 days following the Change in Control and provided that the value of the Company at the time of such Termination is at least US$10 million, in lieu of the payments provided under Section 6.1(b) above, the Company shall pay Executive an amount equal to thirty-six (36) months' base salary at the rate in effect on the date of Termination in a lump sum on the first regular payroll date that falls at least thirty (30) days after the date of Termination and Executive shall also be eligible to receive any incentive compensation awarded to him pursuant to Section 3.2(a) with respect to the calendar year in which the Termination occurs, but shall not be eligible to receive incentive compensation for any subsequent calendar year.

(d) Executive's right to such Termination payments shall terminate and be forfeited in the event that the Executive does not provide the release specified in Section 6.4 below within thirty (30) days following the date of Termination.

(e) If (i) the Termination is as a result of Executive death or (ii) upon his Termination by the Company for Cause or due to Executive's permanent disability or by Executive other than for Good Reason, the Company's sole obligation shall be to pay the Executive any accrued but unpaid salary or other compensation or expense reimbursement payable to the Executive as of the date of Termination.

(f) Upon his Termination for any reason, Executive shall be deemed to have resigned all officer, director, committee membership or other positions held by the Executive with the Companies, provided that Executive may continue to hold any positions he may then hold with Cachet World."

h.  Section 6.2 is hereby deleted in its entirety.

i.  Section 6.3 is amended to include the following introduction and new definitions:

"Capitalized terms used in this Agreement and not expressly defined herein shall have the meanings given to such terms in the LPA as in effect from time to time.

The term "Affiliate" means any entity which is a member of a controlled group which includes the Company or which is under common control with the Company within the meaning of section 414 of the Code, provided that in determining whether or not such common control exists the term "at least 50 percent" shall be substituted in each case where the term "at least 80 percent" is used in section 414 or 1563 of the Code.

The term "Change in Control" means (a) Robert W. Roche or his nominee is no longer the Chairman of the Board of Cachet Cayman or Robert W. Roche and the members of his family, when their interests are combined, do not hold, directly or indirectly through their equity interests in other entities or beneficial interests in one or more trusts, the largest percentage interest in Cachet Cayman or (b) a transaction that constitutes a "change in ownership" of Cachet Cayman or "change in ownership of a substantial portion of the assets" of Cachet Cayman for purposes of Section 409A of the Code and the regulations promulgated thereunder, provided that a change in ownership of a substantial portion of the assets of the Cachet Cayman shall not be deemed to occur unless the assets sold by Cachet Cayman have a total gross fair market value equal to more than eighty percent (80%) of the total gross fair market value of all of Cachet Cayman's assets. The foregoing notwithstanding, in no event shall (i) a transfer to a Person directly or indirectly controlled by a Class A Preferred Limited Unit Holder of Cachet Cayman, whether such transfer in made with or without consideration or (ii) a sale of equity constituting a "change in ownership" of Cachet Cayman in a

5

transaction where a majority of the sale proceeds initially remain in and increase the capital of Cachet Cayman, constitute a "Change in Control".

The term "Equivalent Percentage" means the same percentage of the vested Executive Interest as the percentage of Class A Preferred Limited Units that is sold in a Qualifying Sale.

The term "Full Value" means the amount that would have been received by Executive with respect to the vested portion of the Executive Interest if there had been a sale of all of the Units Cachet Cayman for a price that was equivalent to the price paid for the Class A Preferred Limited Units in the Qualifying Sale followed by a liquidation of Cachet Cayman and distribution of the proceeds of the sale in accordance with Section 5.2 of the LPA. For the avoidance of doubt, in determining Full Value, the unvested portion of the Executive Interest shall be treated as if forfeited immediately prior to the liquidation.

The term "Qualifying Sale" means a sale of Class A Preferred Limited Units of Cachet Cayman for a gross purchase price that equals or exceeds the sum of (A) the aggregate Unreturned Capital of the Class A Preferred Limited Unit Holders and (B) the outstanding balance, including accrued interest, of all Limited Partners Loans made by Class A Preferred Unit Holders in a transaction that does not constitute a Change in Control.

The term "Significant Capital Event" means that one or more Persons who were not Members at the beginning of a Fiscal Year make Capitals Contributions to Cachet Cayman in exchange for Interests during such Fiscal Year in an amount that exceeds U.S.$20 million.

The term "Termination" means a termination of Executive's employment with the Company and all Affiliates for any reason that qualifies as a separation from service for purposes of Section 409A of the Internal Revenue Code of 1986, as amended and Treas. Reg. § 1.409A-1(h).

j.  The "Good Reason" condition in Section 6.3(b)(iv) is amended to read as follows:

"(iv) a Change in Control."

k.  The definition of "Good Reason" in Section 6.3 is amended to include the following at the end thereof:

"The foregoing shall constitute "Good Reason" only if (i) the condition was not consented to in advance by Executive in writing or ratified subsequently and (ii) Executive provides the Company with written notice of such condition within ninety (90) days of the initial existence of such condition and the condition remains in effect thirty (30) days after written notice to the Company from Executive of his intention to terminate his Employment for Good Reason which specifically identifies such condition."

l.  Section 7.2 is amended by the addition of the following new sentence at the end thereof.

"For the avoidance of doubt, Executive acknowledges and agrees that Executive's covenants contained in this Section 7.2, as well as those contained in Exhibit C hereto, shall extend and apply to not only proprietary or confidential information of the Company, but also any and all proprietary or confidential information of any of the Companies."

6

m. Section 7.3 of the Agreement is amended in its entirety to provide as follows:

"During Executive's employment by any of the Companies (whether or not under this Agreement) and for a period of twelve (12) months thereafter, Executive shall not, directly or indirectly, on his own behalf or on behalf of others, take any steps in furtherance of attempts to promote, market, build, open, manage, or operate any hotels or resorts, or component operations thereof, which compete with the Companies or the Urbn brand in the Territory. For purposes hereof, the term "Territory" shall mean the city limits of any city in the world in which, as of the date of Termination, one or more of the Companies: (a) owns, operates, manages or is developing a hotel or resort, or component operation thereof, or (b) has entered into a letter of intent regarding, or has entered into a definitive agreement to own, operate, manage, or develop a hotel or resort, or component operation thereof. For the avoidance of doubt, the restrictions contained in this Section 7.3 shall not preclude or prevent Executive from being employed by or otherwise providing services to Cachet World, a professional consulting firm providing a broad base of consulting services such as Bain or Accenture or from providing services to broad-based travel firms such as Expedia, Travelocity, or Priceline, provided that Executive shall continue to be bound by Sections 7.1 and 7.2 and Exhibit C of this Agreement."

2. Exhibit A to the Agreement is hereby deleted in its entirety and replaced by Exhibit A to this Amendment.

3. All references to the term "Company" in Exhibit C to this Agreement shall hereafter be deemed to mean the "Companies" or any entity included within such term as the context requires.

4. Cachet Cayman hereby agrees to guarantee the performance of the Company of its obligations under the Agreement and this Amendment.

5. Each of this Amendment and the Agreement shall be solely for the benefit of the parties thereto and no other person may assert any right, as a third party beneficiary or otherwise, under or interest in either this Amendment or the Agreement.

6. Except as expressly amended hereby, the Agreement shall continue in full force and effect. All references to the term "Agreement" in this Amendment or in the Agreement shall refer to the Agreement as amended by this First Amendment.

4829-1376-8984.9

IN WITNESS WHEREOF, the parties have executed this First Amendment to Amended and Restated Employment Agreement as of the Execution Date.

CACHET HOTEL GROUP LIMITED (HK)

By: _____

Name: Robert W. Roche
Title: Director

CACHET HOTEL GROUP LIMITED CAYMAN L.P.,
a Cayman Islands exempt limited partnership

By:     Cachet Hotel Group Limited Cayman G.P.. . a
        Cayman Islands exempted limited company. its
        General Partner

By:_____

Name: Robert W. Roche.
Title: Director

_____

ALEXANDER MIRZA

8

4829-1376-8984.9

IN WITNESS WHEREOF, the parties have executed this First Amendment to Amended and Restated Employment Agreement as of the Execution Date.

CACHET HOTEL GROUP LIMITED (HK)

By: _____
Name:  Robert W. Roche
Title:  Director

CACHET HOTEL GROUP LIMITED CAYMAN L.P.,
a Cayman Islands exempt limited partnership

By:     Cachet Hotel Group Limited Cayman G.P., , a
        Cayman Islands exempted limited company, its
        General Partner

By:_____
Name:_____
Title:_____

ALEXANDER MIRZA

8

4829-1376-8984.9

FAC37

**EXHIBIT A**
**TO**
**FIRST AMENDMENT TO**
**AMENDED AND RESTATED EMPLOYMENT AGREEMENT**


As Chief Executive Officer of the Company, Executive shall have oversight responsibility for all aspects of the successful creation, development, management and operation of all of the hotels and other related facilities owned, managed or operated by the Companies ("Company Properties"). Such responsibility may involve creating, developing, managing and operating businesses that provide goods or services to or otherwise benefit the Company Properties (each, an "Affiliated Business" and collectively the "Affiliated Businesses"). Such responsibilities shall include, but not be limited to,

1. Oversee, supervise and coordinate the creation, development and operation of Company Properties and the Cachet Cayman hotel brands internationally through brand management, licensing, franchising, and JV agreements, focusing initially on China and Southeast Asia, and eventually worldwide, including hotels, resorts, service apartments, residences, timeshares, and other multi-use real estate developments.

2. Oversee, supervise and coordinate the creation, development and operation of food and beverage brands, including Laris branded restaurants, newly developed or acquired restaurant brands, celebrity chefs, destination bars and night clubs internationally through licensing, management, JVs and other agreements.

3. Oversee, supervise and coordinate the creation, development and operation of a centralized services fee business, including a Cachet branded hotel portal, encompassing hotel, restaurant and travel distribution and loyalty partnerships that support both owned and affiliated hospitality properties internationally.

4. Other duties as assigned to help support overall growth and strategic development of Company Properties.


To the extent that an Affiliated Business provides goods or services to or otherwise benefits properties that are not Company Properties, without limiting the provision of the Agreement, Executive and such Affiliated Business may enter into a separate employment or consulting agreement governing Executive's duties and responsibilities and compensation, including equity compensation, with such Affiliated Business and related to the provision of goods or services to third parties.

9

## EXHIBIT B

### CACHET WORLD CAP TABLE

| Name | Percentage | Grant Date | Vesting |
|------|-----------|-----------|---------|
| Roche Family Entities | 73.5% | | |
| Alex Mirza | 10.00% | [Date CHG employment agreement amendment executed] | 5.5% on Grant Date and 1.5% on each of the next three anniversaries of the Grant Date |
| David Laris | 2.00% | Date Cachet Cayman grant agreement signed | Second anniversary of Grant Date |
| Martin Key | 2.00% | Date Cachet Cayman grant agreement signed | Second anniversary of Grant Date |
| Yvonne Choi | 2.00% | Date Cachet Cayman grant agreement signed | Second anniversary of Grant Date |
| Invest Hospitality (USA) | 2.50% | TBD | TBD |
| Future President | 5.00% | TBD | TBD |
| Other future employees | 3.00 | TBD | TBD |
| | | | |

10

**SECOND AMENDMENT TO THE AMENDED AND RESTATED
EMPLOYMENT AGREEMENT**

This Second Amendment to the Amended and Restated Employment Agreement dated April 1, 2013 (the "Second Amendment") is made and entered into effective as of this ___ day of May, 2016 by and between Alexander Mirza (the "Executive"), and Cachet Hotel Group Limited, a private company limited by shares duly incorporated under the laws of Hong Kong with its registered address at Room 2008, 20/F, Beverly House, 93-107 Lockhart Road Wanchai, Hong Kong (the "Company").

The Executive and the Company are hereinafter referred to collectively as the "Parties" and individually as a "Party."

**Whereas**

A       The Parties have entered into an Amended and Restated Employment Agreement on April 1st, 2013 and a First Amendment dated May 1, 2014 (collectively the "Agreement").

B       The Parties intend to amend such Agreement in accordance with the terms and conditions hereunder.

**NOW, THEREFORE**, in consideration of the promises, covenants and agreements set forth herein, the Parties agree as follows:

1.       Term of Employment

Section 2 shall be deleted in its entirety and substituted by the following:

The term of the Executive's employment under this Agreement shall commence on April 1, 2013 (the "Effective Date") and shall continue until May 31, 2021 unless terminated pursuant to Section 5 or 6.

2.       Compensation

Section 3.1 and 3.2 shall be deleted in its entirety and substituted by the following:

3.1     Salary.   As compensation for the Executive's service under this Agreement, the Executive shall be entitled to a base salary at the rate of $400,000 a year, payable in equal installment in accordance with Company's customary payroll practices for its employees, but not less than monthly. Such base salary rate shall become effective as of June 1, 2016 and subject to a guaranteed annual increase of 4%.

3.2     Cash Incentives.   In addition to the Executive's base salary, and so long as the Executive is currently employed when such incentives are due and payable to the Company except as set forth in Section 6 with respect to the severance payment, the Executive will be eligible to receive the incentive compensation described herein effective as of June 1st, 2016: (i) annual guaranteed bonus equal to 50% of the Executive's then base salary; and (ii)

-1-

annual discretionary bonus of up to 35% of the Executive's then base salary; the actual amount of the discretionary bonus shall be determined each year by the Board of Directors of the Company based on Executive's performance against goals and benchmarks established by the Board from time to time.

3.    Reimbursement of Expenses, Fringe Benefits.

Section 4.3 shall be deleted in its entirety and substituted by the following:

4.3    Housing Allowance.    The Executive shall also be provided with a housing allowance of US$ 5,000 per month.

4.  This Second Amendment shall be considered as an integral part of the Agreement, and this Second Amendment shall have the same effectiveness as this Agreement.    Unless otherwise defined herein, the terms used herein shall have the same meaning as it is in the Agreement.    Where there is a conflict between this Second Amendment and the Agreement, this Second Amendment shall prevail.

5.  Unless otherwise provided herein, the amendments set forth in this Second Amendment shall become effective forthwith upon execution of this Second Amendment by the Parties, the remaining provisions of the Agreement shall remain unchanged.

*[The remainder of this page is intentionally left blank]*

-2-

**IN WITNESS WHEREOF**, the Parties have duly executed this Second Amendment as of the day and year first written above.

**Alexander Mirza**

By:_____

Name: Alexander Mirza

**Cachet Hotel Group Limited**

By:_____

Name: Robert Roche

Title: Chairman